IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
97 DEC -4 AM 10: 41
U.S. DISTRICT COURT
N.D. OF ALABAMA

FALCON AVIATION, AB, )
a corporation, )
 )
        Plaintiff, )
 )
v. ) CIVIL ACTION NO. 95-G-2631-S
 )
PEMCO AEROPLEX, INC., )
 )
        Defendant. )

ENTERED
DEC 0 4 1997

MEMORANDUM OPINION

        The justiciable issue before the court is whether Ansett Wordwide Aviation, USA [hereinafter Ansett] is bound by the arbitration agreement between Falcon Aviation, AB [hereinafter Falcon] and Pemco Aeroplex, Inc. [hereinafter Pemco]. Ansett has argued there is no case or controversy and has accordingly filed the motion to dismiss for lack of subject matter jurisdiction, or in the alternative, to stay proceedings against Ansett pending arbitration between Falcon and Pemco.

        The instant case is before the court on the following facts:

        1)    Falcon entered into three lease agreements (containing no arbitration clauses) with TNT Norge NA/S [hereinafter TNT] in November 1990 by which

it leased three Boeing 737-300 aircraft, said planes to be returned at lease-end in the same condition as when delivered, excepting ordinary wear and tear.

2) In November 1990, TNT entered into an "Aircraft Modification Agreement" with Pemco by which Pemco agreed to perform certain aircraft modifications for the benefit of Falcon, named as a third party beneficiary.

3) The modifications performed and warranted by Pemco were for the purpose of "quick change configuration," said equipment warranted to be "free from any and all defects in Design, material and workmanship under normal use and service for which it was intended, but only if it has been properly operated."[1] The Modification Agreement specifically provides that "[i]n case of a dispute between the parties concerning a Defect or Defects (arising out of the Modification Agreement), such dispute shall be finally settled by an independent expert mutually acceptable to both parties."

4) After installing the modifications Pemco delivered the modified aircraft to Falcon in October 1991, February 1992, and March 1992.

5) TNT assigned certain of its rights under the Modification Agreement to Falcon on November 23, 1990.

6) On June 14, 1991, TNT and Falcon entered into an Amended and Restated Assignment Agreement in which TNT assigned its rights, claims, and interests under the Modification Agreement to Falcon.

7) On the same day, June 14, 1991, TNT assigned its rights under both the Lease Agreement and the Modification Agreement to Ansett, thus obligating Falcon to return the aircraft to Ansett at lease-end.

8) After delivery to Falcon of the modified aircraft, Falcon notified Pemco that the modifications (added cargo door and its supporting structure)

---

[1] The warranty did not cover normal wear and tear.

2

limited the uses of the aircraft and reduced their cargo capacity, substantially reducing "the capacity and durability of the Modified Aircraft."

9) Efforts to repair the defects have remained unsuccessful, Falcon claiming damages in excess of $50,000.00 at the time of suit.

10) On October 12, 1995, Falcon filed a complaint against Pemco for breach of the Modification Agreement--specifically its warranty provision relating to defects in the modifications.

11) The court granted Pemco's motion for a stay pending arbitration on May 17, 1996.

12) The court granted Falcon's motion to amend its complaint to state a claim for declaratory judgment against Ansett (seeking to force Ansett's participation in arbitration between Falcon and Pemco) and the First Amended Complaint was filed "in arbitration" on August 17, 1997.

12) Falcon's declaratory judgment action against Ansett requests the following declarations with respect to Falcon's rights and obligations under the Lease Agreement:

   a. That this court declare that, for the purposes of determining Falcon's liability under the Lease Agreements, "Ansett is bound by the determination(s) of the arbitrator(s) regarding the existence of defects in the Modified Aircraft and any damages relating to or arising from the Modifications;"

   b. That this court declare that "Falcon has fulfilled its obligations to Ansett under the Lease Agreement and Aircraft Modification Agreement regarding any damages relating to or arising from the Modifications;"

   c. That this court declare that "Falcon cannot be liable to Ansett under the Lease Agreement or Aircraft Modification Agreement for damages relating to or

3

        arising from the Modifications because the Modified Aircraft, with respect to the Modifications performed by Pemco, are in the same condition as when delivered to Falcon at the commencement of the lease term;"

d.    That the court declare that, "[a]s a result of this action, Ansett is foreclosed from seeking damages from Falcon at the conclusion of the leases relating to or arising from the Modifications and that Ansett's sole remedy is a recovery from Pemco;"

e.    That the court declare that "[t]he subject transaction was structured so that Pemco would ultimately be responsible for any damages relating to the Modifications and that as a result, in the event Ansett should, in the future, claim and recover damages from Falcon relating to or arising from the Modifications, Pemco is liable to Falcon to the extent of Ansett's recovery from Falcon."

Falcon has taken the position that it is only entitled to retain damages in any action to the extent they relate to the value of Falcon's lease. Damages attributable to the residual value of the aircraft are payable to Ansett. This suit was filed to determine Ansett's obligations and rights with respect to the modifications under the Lease Agreement.

Having considered all evidence before it, the court holds that the apportionment of damages suffered by Ansett is properly before the court. The Amended and Restated Assignment Agreement of June 14, 1991, between Ansett and Falcon, a portion of which is set forth below, states the following:

4

> [Ansett] does hereby assign to [Falcon] all of
> [Ansett's] rights, claims and interests under the
> Modification Agreement, to the extent the same relate
> to the Aircraft, to enforce, in [Falcon's] own name,
> such rights as [Ansett] may have with respect to the
> Aircraft under any warranty, representation, service
> policy, maintenance and product support plan or spare
> part or service bulletin arrangement (including,
> without limitation, Exhibit G to the Modification
> Agreement) of Pemco, with [Falcon] to retain any
> benefit resulting therefrom to the extent same relates
> to [Falcon's] interest in the Aircraft under the Lease
> Agreements and is not payable as compensation in
> respect of the residual value of the Aircraft.
> [Ansett] and [Falcon] confirm for the benefit of Pemco
> that so long as Pemco acts in good faith Pemco shall
> not have any duty to determine whether any payment made
> by Pemco pursuant to this paragraph constitutes a
> payment in respect to the residual value of the
> Aircraft, any such payment made by Pemco in good faith
> to [Ansett] or [Falcon] shall discharge Pemco's
> obligations in respect thereof.

By the terms of the agreement any damages paid by Pemco to Falcon or Ansett must be apportioned between damages arising under the lease and damages to the residual value of the aircraft. Since a determination of damages is properly before this court, a case or controversy between Ansett and Falcon exists.

The apportionment of damages must be determined now in order to prevent litigating the issue at the end of each of the three lease terms, as contended by Ansett. Due to the modifications agreed to by Ansett and performed by Pemco there will be a decrease in the value of the leased aircraft at lease-end. Pemco has given Falcon notice of the need of a heightened inspection routine and more frequent inspections, requirements which increase the costs associated with maintaining the

5

planes.[2]  Cost increases created by faulty modifications constitute damage to the aircraft and affect the resale/residual value of the aircraft.  The Amended Assignment sets forth the intention of the parties:  any liability arising from the modifications is to be borne by Pemco.  Payment by Pemco will release it from liability.

For the reasons stated above the court holds that the motion to dismiss be and it hereby is denied.

Furthermore, the court holds that Falcon has not waived any right to compel arbitration by seeking declaratory relief.  The waiver of a right to arbitrate due to litigation will normally be found only when demand for arbitration comes long after suit is commenced and when both parties have engaged in extensive discovery.  *Painewebber, Inc. v. Faragalli*, 61 F.3d 1063, 1068-69 (3rd Cir. 1995) (The right to compel arbitration was not waived when demand for arbitration was made less than two months after suit was filed and parties had not conducted discovery or briefing on the merits of the case.).  *See, Morewitz*

---

[2]  In response to the aircraft defects experienced, Pemco issued a "Pemco In Service Activity Report" outlining a three phase project to address the defective modifications.  Phase One of the project, completed prior to issuance of the report, involved a "Structural and Analysis Evaluation.  Phase Two involved an "Inspection Program Upgrade" requiring a heightened inspection procedure, requiring an estimated 2250 manhours, to "ensure the continuing and structural airworthiness" of the modified aircraft.  Phase Three, yet to be performed, involves a "Structural Upgrade" designed to permanently repair the modified aircraft.

*v. West of England,* 62 F.3d 1356, 1366 (11th Cir. 1995) ("Waiver occurs when a party seeking arbitration substantially participates in litigation to a point inconsistent with an intent to arbitrate and this participation results in prejudice to the opposing party.").

There has been no waiver of any right to arbitrate in the instant case. The action was filed, in part, to compel Ansett to participate in the arbitration between Falcon and Pemco. There has been no discovery of any sort between Falcon and Ansett. Ansett has been aware of the controversy from the onset, having participated in the attempted resolution of these issues prior to its being joined as a party. Ansett has not been prejudiced by the filing of this declaratory action.

The court is of the further opinion that even if Ansett is correct in asserting that the dispute arises from the Lease Agreements, Ansett may still be compelled to arbitrate due to the intertwining of relationships and contracts created by the parties in this transaction. In *McBro Planning & Development Company v. Triangle Electrical Construction Company, Inc.*, 741 F.2d 342 (11th Cir. 1984), contractors McBro and Triangle each had a contract with St. Margaret's Hospital to perform renovations, with McBro to be manager. Each contract contained an arbitration clause between the hospital and the contractor, but there was no contract between the contractors. When a

7

dispute arose between McBro and Triangle regarding their respective responsibilities under the agreements, McBro moved to compel arbitration. The district court granted the motion. On appeal the Eleventh Circuit affirmed, ruling that in spite of the lack of a contract between McBro and Triangle, the dispute should be arbitrated because of the close relationship between the parties and the close relationship of the alleged wrongs to McBro's contractual duties to perform as construction manager spelled out within the Triangle-St. Margaret's contract. The claims were "intimately founded in and intertwined with the underlying contract obligations." *Id.*, at 344.

In holding that a nonsignatory to a contract may invoke an arbitration provision contained therein, *Sunkist Soft Drinks v. Sunkist Growers*, 10 F.3d 753, 757 (11th Cir. 1993), *cert. denied, Sunkist Growers, Inc. v. Del Monte Corp.*, 513 U.S. 869, 115 S. Ct. 190, 130 L. Ed. 2d 123 (1994), the court cited *McBro* for the proposition that a party may be estopped from asserting that the lack of a written arbitration agreement precludes arbitration. *Sunkist* noted, too, that *the McBro* reasoning was adopted by the Fourth Circuit in *J. J. Ryan & Sons, Inc. v. Rhone Pouline Textile, S.A.*, 863 F.2d 315 (4th Cir. 1988), when it opined that "[w]hen the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to

8

arbitration even though the parent is not formally a party to the arbitration agreement."

In the case at bar the damage claims of Falcon and Ansett are founded in and intertwined with underlying contractual agreements between Ansett, Pemco, and Falcon. The claims are inseparable and arbitrable, and, therefore, the action should not be dismissed. Since the claims are intertwined the court further holds that Ansett should participate in the arbitration being conducted between Falco and Pemco.

Based on the above reasoning the court holds that the motion to dismiss be denied, the proceedings against Ansett should be stayed pending arbitration between Falcon and Pemco, and Ansett should be a party to the arbitration being conducted by Falcon and Pemco. An order consistent with this opinion is being entered contemporaneously herewith.

DONE and ORDERED this 4TH day of December 1997.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.